Yes, sir. Good morning. My name is Philip Hoffman and I represent Ujin Robot, the appellant and cross-appellate. We urge that the order of the district court be reversed and a new trial granted because, as shown in great detail in our briefs, the jury's verdict was against. The weight of the evidence was excessive and constitutes a miscarriage of justice. Do you have any explanation as to how the jury arrived at the $2,066,700 figure? I do. I've worked it out. I think, Your Honor, if you turn to, in the record, page ER-473, which is where the different elements of the damage claim are listed, the jury, you see the total there is $2.9 million. The jury came back with an award of $2,066,000. I think, and I've got this down to within a couple of thousand dollars, Your Honor, that what the jury did was that the claim for $764,000 for some deal that Synet apparently had with the Korean government, which had nothing at all to do with the robotic vacuum cleaners. Right. I think the jury knocked that out. And I think the jury knocked out the $110,850.84 claim for losses from customer and end-user returns because the evidence was that Synet received 2,240 vacuum cleaners. They sold them all. They got paid for them all. They had none left in inventory. So that there was absolutely no evidence to support that. When you knock those two out, you come out with $2,064,000, and I think that other couple of thousand dollars had to do with there's a final balance up top there, and one of the categories was end-user defective returns. And on that, the parties disagreed by a couple of thousand dollars as to what it was. So I think that's what they did. It's not specified in the verdict, but after spending a lot of time on the math, I think that's how they came out here. All right. So this is, I have two general questions. One is that you spend a lot of time in your brief complaining about the fact that there were no documents. Why does that matter? I mean, if Mr. Ream, is that his name? Ream. Ream stands up and says, this happened, this happened, this happened. I understand they were leading questions, but still, why isn't that competent evidence if he was a percipient witness? It's competent evidence, but the great weight of the evidence is against it. For example, when you come in and you say that we lost $813,000 in profits based on purchase orders that we were unable to fill and were canceled, one would think that the evidence would include purchase orders, purchase order cancellations. But it's not against the evidence. There might have been better evidence, but it's not against it. Well, Your Honor, in terms of weighing the weight of the evidence... Isn't that what juries do? They weigh the evidence. I do agree, Your Honor, that they weigh the evidence, but here I think the absence of evidence in and of itself was far greater than what Mr. Ream's testimony was. Aren't you making an argument to us that it should have been made and was made to the jury? There were arguments made to the jury, Your Honor, but here, at the end of the day, in deciding whether a new trial should be granted, one of the questions is whether or not the actual verdict was against the weight of the evidence and was excessive. I'm sorry. All right. So I find, you know, this absence of evidence not a very strong argument. It seems to me your strongest argument is that with regard to future profits given the Californian law about future profits. But because insofar as they were just arguing that the future profits should be calculated based on how much they were supposed to buy and when, in fact, they hadn't sold very much up until that point, I understand that problem. But why isn't it overcome, or in part at least, by the evidence about Amazon that, in fact, in the period after, I guess, April of 2014, they got a very large number of orders, I don't know how many, that, you know, but certainly proportionally more than what they had sold before that. But, Your Honor, there, they didn't get those orders. The relationship between Ugin and Sinet was terminated, mutually, in June. Well, I know, but why isn't evidence of what orders they would have gotten because they, in fact, came in? Well, they came in because they were up on the website. That's right. But we don't know that they came in, Your Honor. Oh, he said they came in, and then we're back to the other problem. Which is true, Your Honor, but he says they came in, but there was no Amazon witness to testify. There was absolutely... But why is that your argument to the jury? I mean, if you've admitted that the evidence is competent, then the evidence is in. The jury may choose to believe it, may choose not to believe it. Your obligation is to come and say, you heard Rim say this, and there isn't a shred of evidence in support of it. And, Your Honor, that's... And if you can persuade the jury, great. And if you can't, if they believe Rim, then what are we supposed to do? Well, in that particular case, I still think that the court has to look at the evidence that was actually there. And, as I said, I think the lack of purchase orders and the lack of a single cancellation... Let me ask you something. If we didn't agree with you about that, and we thought that, therefore, the evidence about the Amazon orders was of some consequence to the future profit question, beyond simply the fact that they were supposed to buy $20,000 or $30,000, whatever it was, product, how much does that account for? Right. They still don't get there. How much? They claim that they would have made... I think it's $1,050. I'm just going to get you the exact number in sales. It's based on actually $2.5 million worth of sales. All right. So how much is that? Well, it comes out to $813,422 in lost profits. I don't have a calculator in front of me, but that number doesn't get you to the 35,000 units. It gets you to about half of that. It gets you to about half. And the fact of the matter here is, to show that this is speculative, even if you took all the sales that Ugen made when it took over and you added them, you still don't get close to this 35,000 number. But, Your Honor, there's another point, if I may, that I would like to make, is that here the district court stated that it did not find the jury's award of approximately $2 million to sign it to be excessive. And we submit that the district court actually did do that and made that finding when it granted Ugen damages of the $323,000 and thus reduced the damages awarded to sign it. Because if you look at, and we're back on that damage chart again, if you look at ER-473, you see that there's a final balance of $200,000. When you go to the first page of that, ER-469, you see that sign it already gave Ugen credit for that very amount. It was $360,000. Counsel, that means then that if we thought that the evidence was competent and the jury did its job and there weren't grounds for us to overturn it, then we should reverse the district court on the additure of $323,000 because the jury's already accounted for it in its overall verdict. Isn't that the implication of what you're arguing? No, Your Honor. Because what I'm arguing is that once the court found that sign it was granted more damages than it should have been granted, then it had a choice. It had two options open to it. It could have granted a new trial or it could have remitted the award down to $1.7 million and said to sign it. This is the award. If you take it, we're done. If you don't take it, there's going to be a new trial. And here what it did, it reduced that award and counsel for signing it says it right in their papers. It actually specifically refused to do it that way. I don't know why, but it did. It insisted on having two separate judgments and on not reducing the award to sign it, right? But the impact of it is exactly to reduce the award. If the court thought the impact was the same, it could have just done that. It obviously didn't for sign it. But here what happened was the jury was presented with two questions. The first question had to do with what are Eugen's damages. The seventh question had to do with what are sign it's damages. And counsel for sign it got in front of the jury and said, look, you know that we're seeking a net here. So we're looking for $200,000 basically on this expense claim and we're setting off that money. Now you can do a couple of things here. You can in what are sign it's damages, you could put down what their damages are. As a practical matter, if we remand and we tell the district judge that he can do what you said, he has two choices, and he takes the choice of doing the remittiture by decreasing the 2.1 to 1.7, they'll take it and that will be the end of it, right? Well, but they won't take it because what happened is they basically had that choice here. When the judge came down and knocked off the $300,000, then Mr. Perry could have just accepted that counsel for sign it and not appealed it. But they have appealed that ruling. They have said that that ruling violates the Seventh Amendment. In form, it wasn't what you're saying. It was something else. I'm sorry. In form, I understand that it seems the equivalent, but the district judge did explicitly refuse to put it that way. So in form, it wasn't that. Well, I'm not so sure that he explicitly refused to do it that way or that he was even asked to do it that way. I thought he was. I thought in the record you went back and said do it that way, and he said no. He said I'm not going to make it one judgment. I'm going to make it two judgments. Or maybe they did. Somebody asked him to make it all one judgment, and he said no. They went back, sign it went back, and said make it all one judgment, and they didn't. So now we have a situation where we have two competing judgments out there. But at the end of the day, this verdict that came in for assignment wasn't just $2 million. It was basically $2.4 million because they were going to be given cash, and they no longer had to pay the $300,000. Now we have a situation where they only have the $2 million in cash, and that award included that same $360,000. So at the end of the day, what's happened here is their judgment. It's theoretically possible that the jury deducted it, but you have a different explanation for what the jury did. Well, no, Your Honor, there's the jury. I know the jury said zero, but they. They had to. They had to have deducted it. There's not even a question about it because if they didn't deduct it, then at the end of the day, sign it would have to pay Eugen for those vacuum cleaners. When that jury came in two years ago today, actually, when they came in with that verdict, they said to sign it you're getting $2 million in cash from Eugen, and you don't have to pay them. What do you mean they have to have deducted it? I don't understand. Because you came in at the beginning, and you gave us an explanation for what the amount of money was, and it didn't include a deduction for that $350,000. Well, it does actually, Your Honor, because the $200,000 that's part of that calculation, when you look at the damage chart, that $200,000, it includes the deduction. Well, so if they deducted it, then fine. What's the problem? I mean, there's a couple of different ways the jury could have gone. The jury could have gone your way, come back with 2.4, and then awarded your client $300,000, but then it all nets out the same, doesn't it? I understand that you might have liked it to appear that way, but if the jury netted it out already, then they had to account for it in some other way, and the way they decided to account for it was to award your client nothing because they thought that it had already been accounted for elsewhere in their calculation. Well, that's what Mr. Perry told them. He said, send Eugen a message. He says, give – Explain to me what the problem is if, in fact, they've already deducted it. I know you don't like the whole judgment, but if it's deducted from what would otherwise have been the judgment, then what's the problem? Because it was already deducted, and now with the decision of the district court on our new trial motion, what has happened is it's been undeducted. They now have to pay it. The net value was $2.4 million of the jury's verdict, $2 million and a $300,000 credit. Now the district court said, no, I am reducing the net value of your judgment. I am reducing it by over $300,000. That could have been an error. It could have been a mistake because it's already deducted. In other words, How does that hurt you? In terms of hurting us, Your Honor, what happens is the procedure here under the law of remediter has been violated. How does that hurt you? It hurts us, Your Honor, because since they didn't accept the award, we should have a new trial. We are hurt by not having a new trial. What we believe should happen here is that the court should throw out their judgment, should throw out our judgment, send this case back to the trial court, and we have a real trial on damages. Okay. Your time is just about up. Do you want to save some time? Sure. A minute. Thank you. I'm sorry. Good morning. My name is Alan Peary. I represent Sinet. The jury's verdict in this case was not monstrous. It was not grossly excessive. It should not have shocked the conscience of the court. California law with regard to future profits seems to require that when you have an untested company, and this certainly was, that you need some very specific, close to certain evidence of future profits. Where is that here? Well, Your Honor, Mr. Rim was a very experienced businessman who his entire business was connecting Korean manufacturers with U.S. retailers. That's what he'd been doing for 15 years. He had a long-established relationship with the Korean government, was paid as a consultant, had been active in this exact industry. But, in fact, they had promised to sell a certain number of these things and didn't do it. Well, Your Honor. So is credibility enough? Well, it was more than that. Or can you simply go with the if, say, dick set of somebody, this is what I would have made? It wasn't just that. It wasn't just that. What else? He testified that they started the contract in the non-retail purchasing season. The season was actually in the late spring, early summer, is when retailers would purchase a product. Even though that was happening and even though they started the contract in September and that was not the buying season and they had not aired the product on QVC, that was something he knew was very important. There was a delay because their factory didn't meet inspections. So that was delayed until April. Even though that happened, Mr. Rim was able to sell several thousand purchase orders to Costco. In fact, they weren't sold. My understanding is that some of them were not actually sold. They were promised some status of possibly they're going to be sold. Well, no. There were actual purchase orders. There were several thousand purchase orders from Costco, from Walmart, from QVC. There were several thousand purchased products. Were those introduced into evidence? Yes, they were. Yes, they were. In fact, that's another point I want to make is that counsel is trying to convince the court that there was insufficient evidence to support the jury's verdict. However, they didn't provide the whole record. They did not provide all of the exhibits. They didn't even provide all of the courtroom testimony. You mean it's not in the excerpts or it's not in the record? It was not part of the record. What do you mean it's not part of the record? It's in the record. What's the problem? Well, we submitted in our supplemental excerpts. You're talking about excerpts. Excerpts are excerpts. They're not the record. Well, we submitted in our supplemental. You submitted them to the district court. Were they in evidence before the district court? Yes, they were. Okay. Yes, they were. Your complaint is that Eugen didn't put all of that evidence into their excerpts of record on appeal. That's right. Okay, but it's in the record. It's in the record. Which is what was before the district court. That's right. That's all that matters. I'm sorry. I would like to make that. It's in the excerpts. It's not a good practice, but it doesn't matter. Well, it's before you to consider as far as the evidence, and there were 150 exhibits. There was trial testimony that was not included in the public record. We can go read it, and we will. But let me finish what your original question was, what evidence was there. There were purchase orders that were in the record. Again, this was prior to QVC airing. This was during a non-retail purchasing season. There were several thousand units sold by Mr. Rim and his company prior to the QVC airing. When the QVC aired, as Mr. Rim knew and he expected, 7,000 orders were orders in waiting. They were. They're not orders. But they were orders in waiting that happened immediately after the QVC. They're not orders. Pardon? They're not orders. They were orders that would have happened in a very short period of time, according to Mr. Rim. There were seven. It's an order in waiting, something that's not actually an order. It's a possible order. It's basically what Mr. Rim explained. It's an intention that was expressed by the retailers that we intend to purchase this many units. It was in the process, and he expected that those would all turn into purchase orders. Now we're at. California law. Ordinarily, there is expert testimony. In this situation. And something about the market. I mean, some other person than the proprietor saying that this is what I expect to sell. Well, we had better than an expert. We had actual purchase orders. We had actual. But enough to add up? We had. And this was only six months in during the non-purchasing season. We had half of the sales goal. The sales goal for the first year was 20,000. We had 11,000 purchase orders in the first six months. This was prior to the prime buying season. This was right after the QVC airing. We were on target. He was on target to meet and exceed the sales goal of 20,000 units. And at 20,000 units alone, that would have generated $5 million in sales. It would have generated $2 million in profits to sign it. That was only the first year. And as the court knows, or I think the court knows, is that the jury found that there was an enforceable oral agreement. There was an oral agreement that was substantially performed. There was a two-year period under this oral agreement, exclusive distributor agreement. And Mr. Rimm testified very confidently. Again, he was a very experienced in this industry. And he testified that he fully expected to meet these sales goals. And he was right on target. And it was proven. Another huge point is that not only did he have 11,000 purchase orders in the first six months. Let me ask you something. Let me go back a minute. Okay. With regard to the orders that you're talking about, $813,000 or so in unfilled purchase orders or more than that? $13,000? $813,000. Are there any actual purchase orders in the record? Yes, there are purchase orders in the record. Paper in the record. Yes, there are purchase orders in the record. In our supplemental excerpts, we attached some of the exhibits that were not included by UGEN in the appellate record. And there are purchase orders from QVC, from various large companies, Fry's, Costco, Walmart. These were all actual purchase orders that were obtained by Mr. Rimm prior to the QVC airing in April. And this, you know, the contention that they make that there was this sales quota of 2,000 in 2013 and 2,000 in the first three months of 2014, there is absolutely no evidence of that. It's inconsistent with the party's oral agreement that was commemorated in writing. There was no sales quota. In fact, the agreement said it was a two-year contract. These were sales goals. They were not sales quotas. And there could not be a termination of this agreement until after the two-year period. Going back to the documentary evidence, the only evidence on the canceled purchase order that I found for the $813,000 is in the record at 570 to 72, and that's $18,000. That's the one that they provided. You say that the record below contains other purchase orders. Do you have the actual exhibit numbers? Do you have some reference to us where we find that? Well, I submitted in our supplemental excerpts numerous additional exhibits that were not included by UGEN. And those exhibits include purchase orders. And do you have a citation for that? These were in the supplemental record of excerpts, and we have Exhibit 20. This is SCR 236. We have Exhibit 21 all the way up through 42, and that's through SCR 294. Many of those include purchase orders. And those equal, you're telling us those equal $813,000? No, let me explain where those numbers came from. So we have the actual purchase orders that were received by SCINET. We have also the orders in waiting that occurred after the QVC airing. We also have the Amazon orders. Now, it's true they were not in evidence, but it was a stack of documents that thick that Mr. Rimm testified about. I mean, the stack is completely useless. The question is whether Rimm himself, what he said, is enough. But the stacks are relevant. Oh, I understand that. But he testified that even after Eugene canceled this contract, it was not taken down from Amazon, and he received more than $2.6 million of orders from Amazon that he was unable to fill because the contract had been canceled. Those were actual numbers. Those were actual things that happened. Those were not speculation. It was not, you know, when you have an expert that speculates as to future profits,  These were actual orders received. Is that the stack that was never introduced? The $2.6 million from Amazon was a stack. But Mr. Rimm testified it was not objected to. He testified that he received these after the termination by Eugene, and it was competent testimony. Whether it was the best testimony or the best evidence, of course, the best evidence would have been to submit those. In the supplemental excerpts where you say that there are these additional purchase orders. I thought you said $292,000, but there's nothing there. So the summary to get you to the $813,000 is that ER-471. Is that correct? That's the summary that gets you to the $813,000. Okay. And that has the Amazon beach camera brainstorm logistics. And as I understand, I think Judge Berzon is asking you, where's the information that backs the figures for Amazon, for example? Because that's the bulk of it. And that's the first year. And the purchase orders from Amazon were not admitted to evidence. So what, how much, you say $813,000 of purchase orders were submitted? No, you don't say that. No, I don't say that. You certainly represented that when you started this. I'm sorry, no. Where are we now? How many, what number, you say it's more than 18,000. So where is it and what is it? There were purchase orders, there were about 4,000 units purchased and purchase orders evidencing that from QVC, from Amazon, from Costco. Amazon, you don't have any purchase orders from Amazon, I thought. Well, no, we had purchase orders from, there were, for various retailers, we had those purchase orders in record. All right. Some of those purchase orders are included in. ACR what? Let's see. And this is a purchase order from Amazon? These are, let's see, I'll show you what the purchase orders are from. You gave us the numbers just before, you made them up before? No, I was reading from the, I was reading from the contents, table of contents. There were numerous exhibits submitted in our supplemental excerpt. Okay, where are these purchase orders? All right. All right. For example, let's see here. Okay. 245, ACR 245 is a purchase order from Focus Camera. The Focus isn't even listed on the chart that gets you to the 813,000. So if I'm looking at ER 471, this is the evidence that you, this is what the 813,000 figure was based on for net profit from the losses of fixed purchase orders. All right. I've got, and I've got four entries there. I've got Amazon Beach Camera, Brainstorm Logistics, and WinTech Industries. The bulk of those is Amazon. A big, big dog on that page. I mean, the problem is you came in here and you said they didn't give us the right stuff. And in fact, the 813,000 dollars is supported in the SCR. And in fact, now it turns out that the only thing you have about Amazon, which is most of it, is a stack. So that's certainly not supported. It may be adequate just by testimony, but it's not supported. And you haven't shown us anything else that is supported other than $18,000. The problem is you've got that Sargon Enterprises case out of California which says that if you're talking about future profits in a situation like this, they have to be reasonable profits, and puts the burden on the proponent to produce the best evidence available in the circumstances. Isn't the best evidence the actual purchase orders that weren't introduced? Right. Well, the purchase orders from Amazon were not introduced. That's true. But the testimony from Mr. Rim was that he fully expected to achieve the 20,000 units. In the 20,000 units, he explained that there was a certain amount of money that he purchased those products for and a certain amount that he sold those products for. And he testified that his expected – That's the kind of evidence that California has not allowed as sufficient for future profits from a non-tried entity. I mean, one that hasn't performed before. But these were – but, again, these were not speculative numbers. These were actual numbers that were happening already. Within six months, he already had 11,000 either purchase orders or purchase orders in waiting. He had 4,000 units sold prior to the QVC airing and immediately after 7,000 purchase orders in waiting. That may be untrue. Right. The standard under California was best evidence available in the circumstances and the best evidence of future profit if you have a future purchase order is the purchase order, correct? Well, yeah. If we – for the Amazon purchase orders, the best evidence would have been the actual purchase orders in the evidence. That's true. But, again, Mr. Rim testified about those documents. He was not objected to. His testimony was that he received $2.6 million in Amazon orders. In addition – So if you add that up – this is my other question. If you put that in and if you – does that get you to the number of the future profits – I mean, the future profits number that you have to get to?  His testimony was he fully expected, based on the interest of the retailers, it was very well received by the retailers. Again, he had already received 11,000 purchase orders. He fully expected to achieve his sales goal of 20,000. By when did he get 11,000? He had 11,000. He either had – right after the QVC airing, he had 11,000. When was that? That was in April of 2014. I thought some of these went into 2016, which wasn't even – Well, the Amazon came in after the cancellation in June. There was a termination, and then these Amazon came in after that. He had 11,000 orders at the time in April? Yes. The 2.6 million from Amazon, that's not even including – when I said 11,000 purchase orders or purchase orders are waiting, that was notwithstanding the Amazon orders. The Amazon orders came in without any effort whatsoever after the QVC airing, after the termination by Eugene. He fully expected, based on all of this evidence, to achieve the sales goal of 20,000 units. And at 20,000 units, he would have received $2 million in profits. The sale on 20,000 units would have been about 5 million. His net on that was 40 percent, he testified. So he would have received $2 million just in the first year In the second year, he fully expected to achieve the sales goal of 35,000 units. And at 35,000 units, that would have been a total amount of $9 million that he would have received and $3.5 million in profits. That's what he expected. That's not evidence. But it's based on – Your Honor, it's better than an expert saying it's going to happen. It was actually happening. It was in the early stages. There was a two-year contract that was supposed to be in place and not terminated. It was already happening. He already had half of the sales goal achieved in the first part of the first six months. And this was, again, outside of the main purchasing season. It was – many of these purchase orders were received before the QVC airing. And once the QVC airing happened, it took off. And as expected, he received a large response, and the retailers were purchasing right after the QVC airing. It would have gone on had he been allowed to continue. He would have been able to achieve those sales goals. Part of the issue, if you look at ER-471 and you look at the Amazon figure, which is 2-6, the remaining, the beach camera and brainstorm logistics and then wind tech, are only $41,000. So the lost profit of $2.6 million has – that is the bulk of it, really. That is – that's the big enchilada, correct? Amazon, that purchase – yes, that's true. That's the one you didn't have any purchase orders for. We did not have the purchase orders for that particular item. That's true. But if you look at it – You said that there were 11,000 orders before April, but from what I can tell, there were 7,000. Is that wrong? There were 7,000 right after the QVC airing. That was 7,000 purchase orders awaiting, and there was – 7,000 before April is not the right number? No, there were 4,000 approximately before the QVC airing and 7,000 – You told us – you know, you really are shifting gear every time you say anything. You said before there were 11,000 before the QVC. Now you're saying there's 11,000 with the QVC. No, I'm sorry, Your Honor. What – Yeah, I misheard. It was – it's possible that I – it's possible that I misstated, but let me say it again. There were 4,000 actual purchase orders before the QVC airing. There were 7,000 purchase orders or – purchase orders awaiting, what they're called, right after the QVC airing. So had those purchase orders gone to fruition, there would have been 11,000 units sold in just the first six months, and there was the sales goal of the 20,000 by the end of the year. So he still had the primary purchasing season to sell these units after the QVC airing, and he probably would have far exceeded the 20,000 units. If I could get back – Well, I want to ask one question. Yes. On the 300,000 or whatever that was owed or some amount that was owed to Eugen, what is your position? I know your position is that the judge couldn't do what he did. Right. But what difference does it make if, in fact, as was suggested by the chart, it came off at the other end? Well, what I argued at trial and what I believe the jury found is that the actual expenses incurred by Eugen – or, sorry, Sinet far exceeded the amount owed to Eugen. Eugen was owed 323,000. It still had to be accounted for, right? Well, the jury found that the expenses – and we're not talking about the profits and the sales and that sort of thing. But what the jury apparently found was that – and what I argued and what the evidence showed was that the expenses, the rent, the payroll, the other expenses that we itemized, those exceeded the amounts owed to Eugen. And our number was in the 500,000. It was about 200,000 over what was owed to Eugen, and the jury obviously found that that amount canceled out the amount owed to Eugen and awarded zero. It was not proper for the court to issue an editor and give Eugen $323,000 against the jury verdict. If the judge thought that it hadn't been accounted for by the jury and it was a mistake because it was just fixed and admitted. Right. And the judge thought that he could fix it by the editor, which he can't. Right. Then might the judge have granted a new trial here? Well, he should have. If that's what he thought, if he thought there was a mistake by the jury, what he should have done is he should have issued a remediator and reduced our – And he didn't. He didn't. Do we have the authority to issue the remediator here to fix the district court's opinion? I would assert no because – If we don't, then had the district court known that he couldn't have done what he did, might he have ordered a new trial? But that's very speculative. I don't think so because – But it's clear that he thought that something was wrong with the verdict. He tried to fix it himself. He said in his ruling that there was no miscarriage of justice. There was no excess damages. Right. On your side. But he thinks that the jury missed it on the other side. And I think that was because he awarded the motion for summary judgment. He did find it in favor of Eugen on the summary judgment, but he didn't award damages and he left that up to the jury to award damages. It was our argument, and that's what the jury found, was that the expenses exceeded what was owed to Eugen, and that's why there was a zero award. It had to be accounted for in the damages. Pardon? If that's so, it still had to be accounted for in the damages. Right. And I think it was. I think it was. I think that the – Pardon? I understand that, but it still had to come off the expenses then. It had to come off someplace. Right. I think the – well, and that's what I think the jury did, is they took the expenses owed to Sinat, they canceled out the amount owed to Eugen. Either that amount, that $200,000 that was left over, was part of their verdict. And I submit that it was not grossly excessive. I think that the evidence did support the jury's award. In fact, I think the evidence actually supported a higher number than what the jury awarded. I asked for $2.9 million. They awarded $2 million. So I think that the jury's verdict was not grossly excessive. In order for the court to overturn not only the jury's verdict but the judge's decision, you must find abusive discretion and you must find – Okay. Your time is way, way up. Thank you. Thank you very much. Sir, we'll give you, say, three minutes. I'll try to be quicker than that to clear up some confusion. Every single purchase order that is in evidence, including all that Mr. Perry referred to, those aren't new purchase orders. Those are purchase orders, when you look at the dates on them, that came in and that were filled. So part of Sinat's dismal sales record includes fulfilling each one of those purchase orders. So there aren't purchase orders in – not exactly orders. They were orders in waiting, whatever that means, that came in that weren't actually filled. Is that right? There's no evidence of the waiting orders that came in other than a letter from Sinat's counsel. And the year before, when Sinat's counsel said, we have 5,000 waiting orders, it turned out there were about 60. I thought RIM testified that there were these orders. RIM testified that there were waiting purchase orders, but when RIM had said – So there was some evidence for the purchase orders in waiting. Well, you have RIM saying it. Right. But in fact – That is some evidence. It's some evidence. But in practice, Your Honor, the last time he'd said it to you, Jim, he didn't fill them at all. And so here, when you look, you're not going to find – And on the weight of the evidence, the judge should have discounted it. Absolutely, Your Honor. And I'd like to answer a question you asked me before. You said, of those potential profits of the $1,050,000, if we threw in all of these Amazon orders, where would we be? In order to come up with that $1,050,000 number, there would have had to have been $10.5 million of sales of the robotic vacuum cleaners. The Amazon sales that they're talking about only hit $2.6 million, even if all those had happened. QVC sales, all those same sales? No, the QVC sales, I really don't know what they're talking about. Because when they talk about sales that they lost from purchase order cancellations, there's no QVC in there. They named five entities that they claimed they lost orders from and they couldn't fill because they weren't getting product. QVC is not in there at all. And any orders that QVC actually made were filled. And it's part of the 2,240 vacuum cleaners that were sold. So we don't have a situation here where there are all these real orders that weren't filled. All the orders that came in were filled. Their sales record was dismal. And even if you give them credit for all the Amazon sales, all the sales that Eugen made in those two years, and all the sales they made, they still don't come anywhere close towards getting towards these numbers, which were not quotas. All the numbers were in that draft contract, which was never signed, were numbers that said, look, if you don't order from Sineb this many vacuum cleaners, then at the end of the two-year term, and not before, we don't have to go forward. That was it. Thank you very much. Thank you. Thank you so much for your time. Interesting argument and a complicated case. Eugen Ruppert v. Sineb Electronics is submitted and will go to Abrams. Abrams v. Life Insurance Company has been submitted on the briefs. We'll go to Baker v. Roman Catholic Archdiocese.
judges: Berzon, Bybee, Woodcock